2021 IL App (2d) 190772-U
No. 2-19-0772
Order filed August 24, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-996 |
| STEFFON L. PRUITT, | ) ) ) | Honorable Charles E. Petersen, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Bridges and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) The trial court did not err in denying defendant's motion to dismiss the resisting-a-peace-officer count of the indictment for failure to state an offense. (2) The court complied with Rule 431(b) and, as there was no error, there was no plain error and we honor the procedural default. (3) The evidence was sufficient to sustain defendant's convictions for aggravated battery and resisting a peace officer. (4) The trial court did not abuse its discretion in denying defendant's request to give a lesser-included offense instruction of resisting a peace officer on the charge of aggravated battery. Affirmed.

¶ 2   After a jury trial, defendant, Steffon L. Pruitt, was convicted of two counts of aggravated battery (720 ILCS 5/12-3.05(d)(4)(i) (West 2018)) and one count of resisting a peace officer (720 ILCS 5/31-1(a-7) (West 2018)). The trial court merged the aggravated battery convictions, and it

sentenced defendant to 24 months' conditional discharge and 180 hours of public service. Defendant appeals, arguing that (1) the trial court erred in denying his pretrial motion to dismiss count III of the indictment (resisting a peace officer) for failure to state an offense; (2) the court did not comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and the unpreserved issue is not forfeited, where the evidence was closely balanced; (3) the evidence was insufficient to sustain his conviction for aggravated battery (count I); (4) the evidence was insufficient to sustain his conviction for resisting a peace officer (count III); and (5) the court abused its discretion in denying his request for a lesser-included-offense instruction of resisting or obstructing a police officer on the charge of aggravated battery (count I).  We affirm.

¶ 3                                I. BACKGROUND

¶ 4      The incident giving rise to the charges against defendant arose from a traffic stop on May 17, 2018, in Elgin.

¶ 5      Counts I and II of the indictment related to defendant's alleged striking/pushing of a police officer prior to his arrest.  In count I of the indictment (aggravated battery), the State alleged that defendant, in committing a battery, "knowingly made contact of an insulting or provoking nature with Sean Callahan, in that he pushed and/or struck Sean Callahan about the body, knowing Sean Callahan to be a police officer engaged in the execution of his official duties."

¶ 6      Count II of the indictment (aggravated battery) alleged that defendant, committed a battery, "while on public property or a public place of accommodation, being the parking lot area of 10 S. State Street, Elgin, Illinois, in that the defendant knowingly made contact of an insulting or provoking nature with Sean Callahan, in that he pushed and/or struck Sean Callahan on or about the body."

¶ 7 Counts III and IV of the indictment alleged that defendant failed to comply with officers' attempts to handcuff him. Count III (resisting a peace officer), alleged that defendant, "knowingly resisted the performance of Officer Callahan of an authorized act within his official capacity, being the arrest of the defendant, knowing Officer Callahan to be a peace officer engaged in the execution of his official duties, in that the defendant did not comply with officers' attempts to place the defendant in handcuffs, thereby causing injury to the body of Officer Callahan and said resisting was the proximate cause of said injury."

¶ 8 Count IV (resisting a peace officer), of which defendant was found not guilty, alleged that defendant, "knowingly resisted the performance of Officer Mondek of an authorized act within his official capacity, being the arrest of the defendant, knowing Officer Mondek to be a peace officer engaged in the execution of his official duties, in that the defendant did not comply with officers' attempts to place the defendant in handcuffs, thereby causing injury to the body of Officer Mondek and said resisting was the proximate cause of said injury."

¶ 9 Photographs later admitted at trial showed that Officer Callahan sustained a bloody scrape on the knuckle of his left ring finger and that Officer Nicholas[1] Mondek sustained a mark on his right shin.

¶ 10 A. Motion to Dismiss

¶ 11 On May 14, 2019, defendant moved to dismiss (725 ILCS 5/114-1(a)(8) (West 2018)) counts III and IV of the indictment, alleging resisting a peace officer (*i.e.*, Officers Callahan and Mondek), for failure to state an offense. Specifically, defendant argued that the indictment failed to allege a physical act of resistance on his part, because the counts simply alleged that defendant

---

[1] Officer Mondek's first name is incorrectly referenced in the transcript as "Christopher."

"did not comply with officers' attempts to place the defendant in handcuffs." Defendant asserted that the allegation that he failed to comply merely alleged that he failed to cooperate, rather than setting forth some alleged physical act of resistance. He maintained that, because the counts did not apprise him with reasonable certainty of the offenses with which he was charged, they failed to state an offense and should be dismissed.

¶ 12    The trial court denied the motion, commenting that it agreed that the case law defendant cited was distinguishable and, "In addition, in reviewing Counts 2 and 3,[2] there is information about physical pushing and hitting that the Court can also consider as to 3 and 4."

¶ 13                                    B. *Voir Dire*

¶ 14    During *voir dire*, the trial court inquired of the entire venire:

"Now, I am going to read you some principles here. And I will ask whether you accept or reject these principles.

[1] Do you understand *and* accept that the defendant is presumed to be innocent of the charges against him?

Is there anyone who does not understand *or* accept that principle? If so, please raise your hand.

No hands raised.

[2] Do you understand *and* accept that before the defendant can be convicted the State must prove the defendant's guilt beyond a reasonable doubt.

If there is anyone who does not *believe or* accept that principle, please raise your hand.

---

[2] Presumably, the court intended to refer to counts I and II.

No hands raised.

[3] Do you understand *and* accept that the defendant is not required to offer any evidence on his own behalf?

Is there anyone who does not understand *or* accept that principle? If so, raise your hand.

No hands raised.

[4] Do you understand *and* accept that it is the defendant's choice not to testify and, if he were to make that choice, that cannot be held against him?

Is there anyone who does not understand *or* accept that principle? If so, please raise your hand.

No hands raised." (Emphases added.)

¶ 15                             C. Trial

*¶ 16*                      1. *Officer Sean Callahan*

¶ 17    Elgin police officer Sean Callahan testified that, on May 17, 2018, at 12:04 a.m., he happened to be near the J.J. Peppers (a 24-hour convenience store) strip mall parking lot at 10 South State Street in downtown Elgin and observed Officer Mondek initiating a traffic stop. Callahan decided to assist him, activated his emergency lights, and pulled in behind Mondek's vehicle. Mondek approached defendant's vehicle on the driver's side, and Callahan approached on the passenger side. Defendant was the sole occupant of the vehicle.

¶ 18    Officer Mondek informed defendant of the reasons for the traffic stop—headlight and window tint violations—and took note of a two-to-three-foot wooden axe handle-like object in the back seat, which was "easy and accessible." Callahan did not recall the object being in the footwell of the rear seat, which is where Mondek had noted it was in his report. (However, Callahan also

testified that it was in the rear footwell.) Defendant told Mondek that he kept the handle for protection. (Defendant made a reaching motion for the axe handle, and Mondek ordered him to leave it in the back seat.) Officer Callahan testified that Mondek spoke to defendant in a calm tone and did not yell. Upon Mondek's request, defendant provided his identification and insurance information.

¶ 19    Mondek checked defendant's window tint and asked defendant to roll up his window. Defendant complied.

¶ 20    Officer Chad Schuttrow then arrived with his K-9. He exited his squad car, approached the driver's side of defendant's vehicle, identified himself, and asked defendant to step out of the car. Schuttrow was calm and professional. Officer Callahan heard defendant arguing with Schuttrow, who gave multiple commands for defendant to exit his vehicle. At some point, after Schuttrow said, "If you are not going to get out, I will arrest you for obstructing", defendant exited and walked behind the vehicle and to the passenger side, near Callahan. He leaned against the car, and Callahan stated that he could not be that close to the vehicle because the K-9 was going to be walking around it. Callahan's role was to provide an added layer of security for Schuttrow and his K-9, while also keeping visual contact on defendant in the highly-traveled area. For officer-safety reasons, defendant had to be kept away from the vehicle, Schuttrow, and the K-9 until Schuttrow advised whether he could return to the vehicle. Callahan explained that the police were aware that there was one blunt object in the vehicle, but were unaware if there were other weapons or drugs in the car.

¶ 21    At some point, defendant walked near a laundromat in the strip mall, pacing back and forth. Callahan positioned himself as a buffer between defendant and defendant's car; he wanted to protect Schuttrow, whose "main objective" is to be attentive to his dog, and to protect defendant

if he were to approach the dog, who is trained to harm an unfamiliar person who walks up to it. At this point, defendant had not been searched. Officer Callahan described defendant as appearing agitated, based on his comments, general demeanor, his pacing, and his use of profanity toward the officers. He stated, "Don't let that fucking badge go to your head" and made comments that the police "wouldn't have done this if he was white and other comments along those lines."

¶ 22 Callahan testified that he told defendant about a dozen times (but conceded that a video of the stop showed him asking twice) that he could not go back into his car. At one point, Callahan was the only officer next to the car with defendant. Mondek was in his squad car, and Schuttrow was retrieving his K-9. Defendant made a "quick motion" or "quick beeline" to the passenger side and opened the front passenger-side door. Officer Callahan thought that defendant was being non-compliant and, as he was in an agitated state, Callahan was unsure why defendant wanted to return to the vehicle. Defendant stated that he wanted his cell phone, but Callahan was unsure "what it could have been. And we knew there was one potential weapon in the car being the axe handle." Thus, Callahan approached and placed his hand between defendant and the open front car door to prevent him from entering the car. He explained that he put his hand out on defendant's front chest, because defendant had not been listening to verbal commands and "showed a willfulness to not listen to orders and act on his own accord." It was "necessary." Callahan stated, " ' No you are not. Back up.' " He did not tell defendant that he had to wait until the K-9 sniff was done and then he could get his phone. Callahan conceded that he testified before the grand jury that he told defendant he could not return to his car, had to wait until the K-9 sniff was done, and then he could retrieve his cell phone.

¶ 23 Defendant was agitated, confrontational, and defiant when Callahan asked him to back up and get away from the car.

"He was defiant. He was not compliant with that. Even with giving a light push to the sternum area to get him to try to back up on his own, he was fighting back against that, continuing to try to come forward.

The ultimate result was him pushing me in the chest and slapping away my extended arm. I was trying to keep my arm extended to keep him away from me to prevent further confrontation and trying to prevent him from trying to get back into the car."

¶ 24 Officer Callahan testified that his "light push" (with his right hand) was intended to have defendant comply with his order, but it did not work. The men were facing each other at this point. Defendant pushed Callahan in the chest with one hand, and he hit/"smacked" Callahan's extended right hand away. After defendant smacked Callahan's hand, Callahan informed defendant that he was under arrest for obstructing the investigation and for battery to a police officer.

¶ 25 Callahan described the slapping as insulting and stated that it provoked him to arrest defendant. He grabbed defendant's arms (elbows or forearms) to try to place them behind his back. As defendant was facing Callahan, Officer Mondek came from behind and gained control of defendant. (After Mondek grabbed defendant, Callahan "got blocked away.") Defendant pulled away and, in a "jerking motion," tucked in/pulled away his arms. Defendant's body was tensing and "getting into a fighting position." Schuttrow arrived, and he and Mondek took defendant to the ground. This gave the officers the upper hand, because it took away defendant's ability to run away and made it easier to control the situation and slow things down. Callahan explained that, when you have an aggressive assailant, the safest option is to put them on the ground. Schuttrow and Mondek primarily "were doing the pushing and pulling." Defendant's front body fell to the ground and his arms were in front of him. Callahan stated, " 'We are good.' "

¶ 26    While defendant was on the ground, Callahan gave multiple commands to stop resisting and to place his hands behind his back.  Callahan was positioned near defendant's upper back area, gripping defendant between the neck and upper back.  The other officers were giving commands in loud, authoritative voices.  Defendant did not relax his arms or place them behind him.  He brought them toward his side, " 'turtling up,' " which is when someone brings in their limbs like a turtle in its shell "to make it harder to grab and to gain control of their arms and effect an arrest." Defendant put his arms underneath him, under his chest/torso area.  Officers Mondek and Schuttrow were also on the ground with Callahan and defendant.  In his report, Callahan did not state that defendant tensed up his body or that he was getting into a fighting position.  Nor did he write that defendant was turtling up or pulling in his arms.

¶ 27    Officer Ravadan arrived and placed defendant in handcuffs.  The officers pulled up defendant, he was searched, and then placed in Mondek's squad car.  Defendant was compliant at this point.  Sergeant Vanmastrigt, a supervisor, arrived.

¶ 28    Once in his squad car, Callahan observed fresh lacerations to his hands: an open wound on his left ring finger and pinkie that were not present prior to the incident.  Photos of his injuries were admitted into evidence.  Defendant sustained scrapes and a couple of lacerations to his arm, which were also documented.

¶ 29              2. *Officer Nicholas Mondek*

¶ 30    Officer Mondek testified that he used a window tintometer to test the windows on defendant's vehicle during the stop.  He conducted the test in front of defendant to ensure he agreed the tinted windows were too dark and to show him the process was fair.  Mondek also requested a K-9 officer after he noticed the axe handle in the back of the vehicle. When asked about the object, defendant stated that it was for protection.

¶ 31    Sometime after Officer Schuttrow arrived, Mondek, who was in his squad car running defendant's driver's license, heard something, looked up, and saw Callahan stopping defendant from going into his vehicle.  Mondek exited his car and walked to the men, because he heard arguing and feared the situation might escalate.  Defendant made a motion with his left arm and rotated (Mondek did not observe defendant push Callahan on his body), at which point Callahan told defendant he was under arrest.  Mondek repeated what Callahan had stated and grabbed defendant's right arm/wrist and his upper arm to bring his wrist behind his back to put his hand in handcuffs.  However, defendant was pulling away and "pulling towards the center of his body." It was not caused by another officer making his arm move; rather, it was defendant trying to pull away from Mondek.  Mondek could not bring defendant's arm behind him, so he put his hand on defendant's inner thigh, lifted him up, and took him down to the ground.  Defendant's right arm landed under him.  Mondek tried to grab defendant's arm, but it was underneath defendant, tucked in.  Defendant was tensing and holding his arm "there trying to prevent [Mondek] from pulling it out."  Officers Callahan and Schuttrow were also on the ground with Mondek.

¶ 32    Subsequently, Officer Ravadan arrived and put defendant's left hand in handcuffs, after which Mondek pulled out defendant's right hand and Ravadan handcuffed it.  They stood up defendant and walked him to the squad car.

¶ 33    Afterwards, Mondek noticed that, as a result of trying to handcuff defendant, his right shin was scraped, and he documented the injury.

¶ 34    In a prior profession, Mondek played professional football as an offensive lineman.

¶ 35    Mondek initially testified that he could not recall if, at some point, he and Shuttrow were pulling defendant in different directions.  However, he also stated that all three officers had hands on defendant and, when asked again if they were moving in different directions, answered, "I

would assume so. I mean, like—were we all going—all going straight? We were not all going straight. But I would also say I don't—I don't know."

¶ 36    Mondek testified that, at one point, someone ordered defendant to roll onto his stomach to allow Mondek to more easily pull out his arm. The officers forced defendant onto his stomach. Mondek felt resistance with defendant trying to keep his arm tucked.

¶ 37                                    3. *Officer Chad Schuttrow*

¶ 38    Officer Schuttrow testified that, when he arrived at the traffic stop, Mondek asked him to perform a narcotics sniff of the exterior of defendant's vehicle. Schuttrow informed defendant that he was going to do so, and defendant asked if the officer smelled "weed." Schuttrow responded that he did not, requested that defendant exit the car, and defendant asked why he had to do so. This exchange was repeated. At one point, defendant made several requests that the officers call a supervisor. Schuttrow made the call before returning to his squad car.

¶ 39    Schuttrow asked defendant to exit his car before the perimeter sweep with the K-9 for officer safety purposes, but he did not tell defendant it was for safety reasons. Schuttrow explained that he had to concentrate on the dog and, thus, could not watch defendant. Also, there is always a risk an occupant will drive forward or backward during the sweep, which raises safety concerns. Further, he explained that, for their own safety, occupants cannot stand next to their vehicle or lean on it during the search, because the dog might be threatened and put the person in harm's way if the occupant becomes agitated.

¶ 40    While Schuttrow retrieved his dog from his squad car, he heard a commotion. He secured the dog in his vehicle and ran toward the commotion, yelling, "Take him" and "For obstruct." Schuttrow testified that he could not recall if he saw defendant push Callahan.

¶ 41 Sometime after defendant was arrested and while still at the scene, Schuttrow spoke to Callahan. Schuttrow stated that the officers were pulling defendant in different ways to place him under arrest. After the supervisor, Sergeant Vanmastrigt, arrived, Schuttrow spoke to him and stated that there was a point where the police were pulling defendant in different ways throughout the entire interaction. "We did a little bit of the 'I will pull him this way and you pull him that way.' " Schuttrow denied that this was a tactic he used, claiming that it was, instead, unintentional.

¶ 42 Footage from the stop retrieved from Schuttrow's body camera was admitted into evidence and played for the jury.

¶ 43                     4. *Sergeant Chad Vanmastrigt*

¶ 44 Sergeant Vanmastrigt testified that, when he arrived at the stop, defendant had already been arrested. He spoke to defendant while defendant was in the squad car. Defendant was respectful.

¶ 45                     5. *Defendant*

¶ 46 Defendant, age 23, testified that on May 17, 2018, while driving home from work, he was pulled over by the police. He pulled over quickly after he saw the lights behind him. Two officers approached his car, one on the driver's side and another on the passenger's side. He was pulled over because his headlight was out. Defendant knew it had been out for about one day, but did not have time to get it fixed because he was working.

¶ 47 The officers asked for his license and insurance, and defendant provided the information. The officers questioned defendant about the tinted windows on his car and the axe handle in the back seat. He tried his best to be cooperative and polite. At some point, two more officers arrived on the scene. One of them approached on the driver's side and asked defendant to exit the vehicle. Defendant asked why, but the officer did not give a reason. Defendant then asked him to call a

sergeant because he was confused as to why the officer kept asking him to exit the vehicle. He was also scared.

¶ 48    Eventually, defendant exited the vehicle because the officer stated that, if he did not, he would arrest defendant for obstructing justice. Defendant did not want to go to jail, so he got out. He walked away from the vehicle as the officers had requested. Defendant wanted to retrieve his cell phone from his car to call his mother, with whom he lived, to tell her what was going on.

¶ 49    When asked if he was cooperative and polite for the entire encounter, defendant replied "For the most part." At one point, defendant rolled down his front passenger-side window and officer Callahan was standing there. Defendant stated, "Why are you looking in my car?" or "You got a problem?" and "You all looking through my shit?" When he got out of his car, defendant did not immediately walk away. He first stood by the rear passenger tire. Callahan informed him that he could not be near the car, and defendant moved away and paced around.

¶ 50    Defendant testified that Officer Schuttrow told him that he was going to perform an exterior search of his vehicle with his K-9 and that is why defendant had to exit his car.

¶ 51                          6. *Body Camera Footage*

¶ 52    Video footage from the incident was admitted into evidence and played for the jury during the State's case in chief. As relevant here, Officer Callahan's body camera footage reflected that defendant was clearly frustrated about being asked by Mondek to exit his vehicle. When defendant walked over to the passenger side of the vehicle and leaned against the rear passenger door, Callahan told him he could not be near the car "because the dog is going to go around the car." Defendant paced and complained to Callahan. At one point, he tried to open the front passenger door of vehicle, and Callahan told defendant, "No. You are not going back in the car." Defendant stated that he was going to get his phone. As defendant faced his car, Callahan grabbed defendant's

right arm (just above his elbow) from behind. Defendant stated that he was getting his cell phone, and Callahan responded that he was not. Defendant turned toward his right, *i.e.*, facing Callahan, at which point the officer's right hand grabbed defendant's chest just under defendant's left arm and Callahan's left hand tried to grab defendant's right arm; defendant moved his arm up and away from Callahan's reach. Defendant stated, several times, "Don't push me" and "I can get my phone." Callahan repeatedly instructed defendant to step back. Defendant, whose left arm was extended overhead, then quickly moved it downward, and his hand slapped Callahan's forearm. Callahan announced, "Ok, now you're under arrest, you're under arrest, you're under arrest."

¶ 53   Mondek approached Callahan and defendant, and a struggle ensued, with Mondek trying to grab defendant's right arm. Callahan appeared to lose grip of defendant, and defendant, facing away from Callahan and Mondek, took several steps forward, *i.e.*, away, from the officers, at which point officer Schuttrow approached defendant from defendant's front. Defendant was brought to the ground. The officers instructed defendant to stop resisting and to relax. Defendant cooperated. Defendant stated, "I am relaxed." One officer instructed defendant to roll onto his stomach. Defendant responded, "You don't have to push my motherfucking [unintelligible]." An officer stated that he was going to put handcuffs on defendant. Defendant was handcuffed.

¶ 54   Officer Mondek's body camera showed that, when Mondek was in his vehicle operating a car computer, he responded to noises near defendant's vehicle. Mondek approached Callahan and defendant. He reached them just as Callahan announced to defendant that he was under arrest. Callahan held both of defendant's upper arms from behind defendant, Mondek's right hand grabbed defendant's right arm (at the wrist) from behind. Mondek twice stated, "You're under arrest." With Mondek's arm holding defendant's right wrist, defendant walked forward several

steps (*i.e.*, away from the officers), Schuttrow arrived, and then, after a very brief struggle, defendant was brought to the ground.

¶ 55    Officer Schuttrow's body camera showed that, after Schuttrow secured his canine in his squad car, he approached defendant's car, stating "Just take him. Just take him. For obstruction." He grabbed defendant's left arm and assisted two other officers to restrain defendant. After about five or six seconds, defendant was taken to the ground. The officers repeated, "Stop, stop," and defendant replied, "I'm not even doing nothing," and "Y'all doing this for what reason?" The officers instructed defendant to relax, and defendant, appearing relaxed and compliant, was handcuffed.

¶ 56                              7. *Jury Instruction Conference*

¶ 57    During the jury instruction conference, defense counsel asked that instruction Nos. 6 to 10, lesser-included offense instructions for resisting or obstructing a peace officer, be given as to count I (aggravated battery to a peace officer based on pushing/striking officer Callahan). Counsel argued that Callahan was acting in his official duties and that defendant interfered with this by placing his hands on him. The State objected, arguing that the video evidence depicted defendant striking/slapping an officer and that defendant's act was insulting and provoking. The trial court denied counsel's request. The court stated, "I see it, if there is going to be any finding of guilty along the lines of the State, if that is going to happen," and it refused the instructions.

¶ 58    The jury found defendant guilty of counts I, II, and III and not guilty of count IV (resisting a peace officer as to Mondek).

¶ 59                              8. *Verdict and Posttrial Motion*

¶ 60    In his amended motion for judgment notwithstanding the verdict (NOV), defendant argued that the court erred in denying his motion to dismiss count III of the indictment and in denying his

request to instruct the jury on the lesser-included offense of resisting or obstructing a peace officer as to count I. He also argued that the evidence was insufficient to sustain the convictions. The trial court denied the motion:

> "[M]y understanding the Defendant's theory in this case was that he denied doing any act of resisting or obstructing at all. He argued that he did not resist, but claimed that the police were the ones who were pulling and shoving and pushing him while he was on the ground. The Defendant wholly denies resisting, therefore I felt it was proper to deny the Instruction on a lesser-included charge of Resisting.
>
> ***
>
> Factually, Callahan testified that the Defendant slapped and struck Callahan's hand. The defendant denied any such activity, the posture of the cases I saw was that the Defendant was guilty of aggravated battery or not guilty of any charge, therefore the Instruction on the lesser-included was not required."

¶ 61 On defendant's argument concerning the indictment, the court commented that it "was a pretrial issue that has been decided by Judge Hall. I was not present and I'm not going back to act as an Appellate Court regarding his actions." The court distinguished a case upon which defendant relied in which there was no act of resistance by the defendant, and it noted that, here, defendant was found to have actively resisted—"pushing or slapping an officer's wrist"—and "the State's witnesses testified that he struggled and resisted while being handcuffed."

¶ 62 On September 4, 2019, the court sentenced defendant to 24 months' conditional discharge and 180 hours of community service. The court merged counts I and II, as they were based on the same act. Defendant appeals.

¶ 63                                    II. ANALYSIS

¶ 64    A. Motion to Dismiss Count III – Resisting a Peace Officer (Officer Callahan)

¶ 65    First, defendant argues that the trial court erred in denying his pretrial motion to dismiss count III of the indictment for failing to state an offense.

¶ 66    Again, count III alleged that defendant:

"knowingly resisted the performance of Officer Callahan of an authorized act within his official capacity, being the arrest of the defendant, knowing Officer Callahan to be a peace officer engaged in the execution of his official duties, in that the defendant did not comply with officers' attempts to place the defendant in handcuffs, thereby causing injury to the body of Officer Callahan and said resisting was the proximate cause of said injury."

¶ 67    A person commits resisting or obstructing a peace officer, when he or she "knowingly resists or obstructs the performance by one known to the person to be a peace officer *** whose violation was the proximate cause of an injury to a peace officer[.]"  720 ILCS 5/31-1(a), (a-7) (West 2018).

¶ 68    Defendant maintains that the allegation that he "did not comply with officers' attempts to place [him] in handcuffs" did not allege any physical act of resistance that constituted resisting a peace officer.  Defendant asserts that the court committed two analytical errors: (1) it improperly considered factual allegations in the grand jury transcript, as well as counts I and II of the indictment, which charged defendant with aggravated battery based on conduct the State affirmatively indicated was distinct from the conduct underlying count III; and (2) the court improperly considered whether defendant had shown prejudice, which was not required because he challenged the sufficiency of the charging instrument before trial.  Defendant argues that the court should have considered only the facts alleged in count III and whether they strictly complied

with the statutory pleading requirements. Had it done so, he asserts, the court would have dismissed the charge for failure to state an offense, because it did not specify any act of physical resistance on his part. Rather, it vaguely referred to defendant's failure to cooperate with officers' attempts to place him in handcuffs, which is insufficient to state the nature and elements of resisting a peace officer.

¶ 69    A defendant has a fundamental right, as set forth in section 111-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/111-3 (West 2018)), to be informed of the nature and cause of criminal accusations made against him or her. *People v. Rowell*, 229 Ill. 2d 82, 92-93 (2008). "The purpose of a motion to dismiss for failure to state an offense is to challenge the sufficiency of the allegations in the complaint, not the sufficiency of the evidence." *People v. Sheehan*, 168 Ill. 2d 298, 303 (1995). In order to withstand a pre-trial motion to dismiss an indictment for failure to state an offense, a charging instrument must strictly comply with the explicitly stated requirements of section 111-3(a) of the Code of Criminal Procedure. *Rowell*, 229 Ill. 2d at 93. "If the indictment or information does not strictly comply with the pleading requirements of section 111-3, the proper remedy is dismissal." *Id.*

¶ 70    The primary purpose of charging instruments is to permit the defendant to properly prepare a defense. *People v. Woodrum*, 223 Ill. 2d 286, 297 (2006). The sufficiency of a charging instrument is a question of law we review *de novo*. *People v. Swartwout*, 311 Ill. App. 3d 250, 256 (2000).

¶ 71    In *People v. Nash*, 173 Ill. 2d 423 (1996), the supreme court stated:

"Under section 111-3, the charging instrument must set forth the nature and elements of the offense charged. 725 ILCS 5/111-3(a)(3) (West 1992). Where the statute defining the offense specifies the type of conduct prohibited, this requirement is satisfied

if the charging instrument states the offense in the language of the statute. Where, however, the statute does not define or describe the act or acts constituting the offense, a charge couched in the language of the statute is insufficient. The facts [that] constitute the crime must be specifically set forth. See *People v. Hughes*, 229 Ill. App. 3d 469, 473 (1992)." *Nash*, 173 Ill. 2d at 428-29.

¶ 72    Defendant relies on *People v. Leach*, 3 Ill. App. 3d 389, 395 (1972), where reviewing court reversed the defendant's conviction on the basis of a defective complaint. The complaint purported to charge the defendant with resisting or obstructing a peace officer, alleging that "she knowingly obstructed the performance" of the officer while the officer was acting in his official capacity. *Id.* at 393. The court held that the complaint failed to describe any physical act by the defendant that constituted resisting or obstructing the officer. *Id.* at 394. Because the statute does not particularize the offense or describe acts constituting the crime, the court reasoned, "a charge solely in the language of the statute is not sufficient." *Id.* The complaint, which merely tracked the statutory language, was insufficient and, thus, did not give the defendant notice of the crime. *Id.* at 395.

¶ 73    In *People v. Stoudt*, 198 Ill. App. 3d 124 (1990), another case upon which defendant relies, the court affirmed the dismissal of a complaint count alleging resisting a peace officer. *Id.* The complaint alleged that the defendant "knowingly refused to remove himself from the 400 block of Lincoln Highway, De Kalb, *** after being instructed to do so by [the officer], knowing [the officer] to be a peace officer engaged in the execution of his official duties." *Id.* at 127. As to the element of an act of physical resistance, the court rejected the argument that the allegation that the defendant refused to remove himself from the "400 block of Lincoln Highway" satisfied the element. The court held that refraining from any physical action was not a physical act of

resistance. *Id.* "An allegation of failure to *cooperate* with an officer is not necessarily the same as *resisting* or *obstructing* an officer." (Emphases in original.) *Id.*

¶ 74    Defendant argues that the allegations did not describe what physical act of resistance that he allegedly engaged in and, therefore, the indictment failed to state an offense. Further, count III implied only inaction on defendant's part, *i.e.*, noncompliance with officers' unspecified attempts to place him in handcuffs. To satisfy section 111-3, defendant argues, count III needed to describe what, if any, physical acts constituted his "failure to comply" and the officers' "attempts" to place him in handcuffs. Absent such a description, it is impossible, he urges, to determine what, if any, acts of physical resistance he engaged in so as to resist arrest, and the count failed to adequately describe the nature and elements of the charged offense and to strictly comply with the statute.

¶ 75    We agree with the State that more recent case law supports a conclusion that the indictment adequately apprised defendant of the charges against him and strictly complied with the statute. In *People v. Synnott*, 349 Ill. App. 3d 223 (2004), the court held that a complaint sufficiently alleged obstructing a peace officer, where it charged that the defendant " 'knowingly obstructed' " the officer's performance " 'of an authorized act within his official capacity, being the investigation of a potential intoxicated driver, *** in that he repeatedly refused to exit the car he was driving when ordered by [the officer] to do so.' " *Id.* at 224, 228. The court, reviewing case law, determined that the distinction between acting and refraining from acting was *not* dispositive. *Id.* at 226-27. Noting that, in common usage in the criminal context, the word " 'act' " is broadly used and includes the failure to act, and further noting that, as case law has held that interference with an officer's discharge of his or her duties may consist of inaction (*id.* at 227 (referencing *City of Chicago v. Meyer*, 44 Ill. 2d 1, 6 (1969) (anti-war protester failed to disperse; upholding conviction for interfering with police))), " 'obstruction,' " which is synonymous with

" 'interference,' " also consists of inaction. *Id.* at 227. The court distinguished *Stoudt*, which dealt only with the question of whether a refusal to move constituted an act of resistance; it did not consider the separate definition of obstruction; and where subsequent case law had focused on whether the officer was engaged in an authorized act and whether the defendant impeded the act, not on whether the charged conduct was action or inaction. *Id.* at 227-28. The court also concluded that practical considerations, including officer safety, warranted a focus on the officer's act and the defendant's actions. *Id.* at 228. "If a civilian whose presence at a particular location impedes lawful police activity may refuse to move without fear of prosecution, confrontations with police are far more likely to achieve a physical dimension, substantially increasing the physical danger to both the officer and the civilian." *Id.* Accordingly, the court held that the complaint sufficiently charged the defendant with obstructing a peace officer, where the officer could properly request the driver to exit the vehicle pending completion of the stop without violating the fourth amendment. *Id.*; see also *People v. Raby*, 40 Ill. 2d 392, 400 (1968) (holding that complaint adequately charged resisting or obstructing a peace officer, where it alleged that the defendant, " '[w]hen placed under arrest ***, refused to voluntarily accompany arresting officer and had to be physically carried away' ").

¶ 76     Again, here, the indictment alleged that defendant "did not comply with officers' attempts to place the defendant in handcuffs." This was sufficient to apprise defendant of the charges against him and strictly complied with section 111-3. See, *e.g.*, *Raby*, 40 Ill. 2d at 400. Furthermore, as the State notes, the indictment clearly set forth the authorized act that the officers were performing, specifically, arresting defendant. See, *e.g.*, *City of Champaign v. Torres*, 214 Ill. 2d 234, 242 (2005) ("an arrest made by a peace officer is an 'authorized act' even if the arrest is unlawful"). *Cf. People v. Hilgenberg*, 223 Ill. App. 3d 286, 287, 290-94 (1991) (affirming

dismissal for failure to state offense of obstructing a peace officer; complaint alleged that each of the defendants knowingly obstructed the investigation of complained of unlawful alcoholic beverage consumption, where each "refused to open the door or permit the entry of the" deputy; "[t]he difficulty in determining whether action or inaction is punishable, we believe, stems at least in part from attempting to analyze the lawfulness of an action or inaction outside the context of the statute: the act of obstructing or resisting must be in response to an authorized act of the officer"; holding that complaint was insufficient, where no facts alleged that the officer's demand to open the door or that he be permitted to enter, such as allegations that the officer was acting on the basis of a warrant, consent, or probable cause to arrest coupled with exigent circumstances, was lawful, coupled with the fact that no facts sufficiently alleged the commission of acts of resistance or obstruction by the defendants).

¶ 77    Defendant argues that *Synnott* is distinguishable because, here, he was specifically accused of *resisting* a peace officer and the State chose to characterize his alleged noncompliance as an act of physical resistance.  In *Synnott*, he further notes, the defendant was charged with *obstructing* a peace officer's investigation by repeatedly refusing to comply with the officer's orders to exit his vehicle.  *Synnott*, 349 Ill. App. 3d at 224.

¶ 78    Defendant's characterization of *Synnott*'s holding is incomplete.  Although the *Synnott* court noted that *Stoudt* dealt only with an act of resistance, it also articulated two separate bases that questioned *Stoudt*'s holding.  First, it noted that subsequent case law focused on whether police were engaged in authorized acts and whether the defendant had impeded the acts, and second, it discussed the importance of practical considerations, such as officer safety.  *Synnott*, 349 Ill. App. 3d at 227-28.

¶ 79    We also reject defendant's argument that the indictment's language that the officers' attempts to handcuff defendant "may have amounted to no more than verbal requests intended to facilitate that process" and that defendant's noncompliance "may have been mere argument or failure to cooperate."   This argument fails, because the indictment alleged that defendant's noncompliance was the proximate cause of Callahan's injury.   Thus, the noncompliance was physical, not merely verbal.   In a similar vein, in his reply brief, defendant cites for the first time to *People v. Baskerville*, 2012 IL 111056, where the supreme court addressed whether a person may commit obstruction of a peace officer by means of a nonphysical act, specifically, providing false information.   It held that the term obstruction encompasses conduct that impedes or hinders progress, such as providing false information.   *Id.* ¶¶ 23, 29.   In addressing the issue, the court noted that the statute contains two prohibitions, resist or obstruct.   *Id.* ¶ 25.   " 'Resist' " is defined as 'to withstand the force or the effect of' or the exertion of 'oneself to counteract or defeat.' "   *Id.* (quoting Webster's Third New International Dictionary 1932 (1961)).   It "implies some type of physical exertion in relation to the officer's actions."   *Id.*   Here, again, the indictment alleged that defendant's noncompliance, *i.e.*, his resistance to Officer Callahan's efforts to place him in handcuffs to effect the arrest, was the proximate cause of Callahan's injury.   As set forth in the indictment, defendant's resistance necessarily had to be physical, because it was in response to Callahan's physical attempts to place him in the handcuffs and because it resulted in physical injuries to the officer.

¶ 80    Finally, given that we may affirm the trial court's judgment on any basis supported by the record (*People v. Kane*, 2013 IL App (2d) 110594, ¶ 20), we do not reach defendant's argument that the trial court applied the wrong analytical framework.

¶ 81    In summary, the trial court did not err in denying defendant's motion to dismiss count III of the indictment.

¶ 82                                B. Rule 431(b) Principles

¶ 83    Defendant next argues the trial court failed to comply with Rule 431(b) when questioning potential jurors during *voir dire*.  Specifically, he argues the court failed to ask the venire whether they both understood and accepted each of the Rule 431(b) principles.  Further, although defendant acknowledges that he did not preserve this issue for appellate review—due to his failure to raise the issue with the court at any point during the underlying proceedings—he contends that we may, nevertheless, consider the merits of his claim pursuant to the plain-error doctrine, as the evidence was closely balanced.

¶ 84    "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."  *People v. Sebby*, 2017 IL 119445, ¶ 48.  A defendant's failure to take either step results in forfeiture of the issue on review.  *Id.*  However, under the plain-error doctrine, we may excuse a defendant's forfeiture when "a clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error"; or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.)  *Id.*  "The initial analytical step under either prong of the plain-error doctrine is determining whether there was a clear or obvious error at trial."  *Id.* ¶ 49.

¶ 85    The federal (U.S. Const. amends. VI, XIV) and state constitutions (Ill. Const. 1970, art. I, § 8) guarantee a criminal defendant the right to trial by an impartial jury.  *People v. Wilson*, 303 Ill. App. 3d 1035, 1041 (1999); see also *People v. Terrell*, 185 Ill. 2d 467, 484 (1998) ("The

purpose of *voir dire* is to assure the selection of an impartial panel of jurors who are free from bias or prejudice."). The purpose of Rule 431(b) questioning is to help ensure an impartial jury. *People v. Thompson*, 238 Ill. 2d 598, 614 (2010).

¶ 86 Rule 431(b) sets forth certain requirements for the trial court when questioning potential jurors in a case during *voir dire*. It states as follows:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

We review *de novo* a trial court's compliance with Rule 431(b). *People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 87 During *voir dire*, the trial court inquired of the entire venire:

> "Now, I am going to read you some principles here. And I will ask whether you accept or reject these principles.
>
> [1] Do you understand *and* accept that the defendant is presumed to be innocent of the charges against him?

Is there anyone who does not understand *or* accept that principle? If so, please raise your hand.

No hands raised.

[2] Do you understand *and* accept that before the defendant can be convicted the State must prove the defendant's guilt beyond a reasonable doubt.

If there is anyone who does not *believe or* accept that principle, please raise your hand.

No hands raised.

[3] Do you understand *and* accept that the defendant is not required to offer any evidence on his own behalf?

Is there anyone who does not understand *or* accept that principle? If so, raise your hand.

No hands raised.

[4] Do you understand *and* accept that it is the defendant's choice not to testify and, if he were to make that choice, that cannot be held against him?

Is there anyone who does not understand *or* accept that principle? If so, please raise your hand.

No hands raised." (Emphases added.)

¶ 88    Defendant argues that the trial court erred in asking the venire: (1) if they did not "believe or accept," instead of understood and accepted, the second principle; and (2) whether they understood *or* accepted, instead of understood *and* accepted, the first, third, and fourth principles.

¶ 89    In response, the State relies on *People v. Lilly*, 2018 IL App (3d) 150855, to argue that no error occurred. In *Lilly*, the court held there was no error in the trial court's questioning of the

venire, where the court asked potential jurors whether they had any disagreement with certain principles immediately after asking (and before seeking answers) if they understood and accepted those principles. *Id.* ¶¶ 11-15 (" 'Do you *understand and accept* the following, that the State has the burden of proving the Defendant's guilty beyond a reasonable doubt? The Defendant does not have to prove his innocence, does not have to present any evidence on his or her own behalf. Do you *have any disagreement* with those principles of law?' "). The court explained that there was no error in seeking responses in the negative and no error in asking a series of questions. "That the disagreement question was posed last in the series does not negate the previous two questions" concerning whether they understood and whether they accepted the principles. *Id.* ¶ 15. The court also noted that "while the rule mandates that the court ask two questions of the venire, it cannot be read to proscribe any additional questions." *Id.* ¶ 13. Here, the State contends that, because the court asked the venire if they understood and accepted each principle immediately before asking if they understood/believed or accepted each principle, there was no error.

¶ 90    The trial court prefaced its questioning on each principle with the correct phrase, "Do you understand and accept." Immediately thereafter, for three of the principles, it asked, "Is there anyone who does not understand *or* accept that principle?" We conclude that there was no error in this portion of the questioning. First, *Lilly* instructs that this is permissible. Second, the combination of the negative and disjunctive phrasing in the second sentence would have properly identified any jurors who did not either understand or accept (or both understand and accept) any Rule 431(b) principle. The rule requires that jurors do both, and asking whether any potential juror did not either understand or accept would have identified any individuals who could not properly execute their duties.

¶ 91    As to the principle concerning the State's burden of proof, the court, again, prefaced its questioning with the correct phrase, "Do you understand and accept," but immediately thereafter asked, "Is there anyone who does not *believe or accept* that principle[.]"  The problem with the term "believe" is that it is synonymous with accept and does not mean to understand.  See *believe*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/believe (last visited July 8, 2021) (defined as "to consider to be true or honest" and "to accept the word or evidence of"); *understand*, Black's Law Dictionary (11th ed. 2019) (defined as "[t]o apprehend the meaning of; to know"); *accept*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/accept (last visited July 8, 2021) (defined as "to give admittance or approval to").  However, we conclude that there was no error in the questioning, as the phrasing here was sufficiently similar to that in *Lilly*, where the court's second question asked only if any jurors disagreed with the principle.

¶ 92    *Lilly* distinguished *People v. Wilmington*, 2013 IL 112938, where the supreme court held that the trial court erred in asking whether the jurors disagreed with the Rule 431(b) principles and did not ask if they accepted them.  *Id.* ¶ 32 ("While it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself.") (Emphases in original.).  Here, defendant argues that this case is analogous to *Wilmington*.  We disagree.  The trial court in that case did not preface its questioning with the correct phrasing, as did the trial courts in *Lilly* and in this case.

¶ 93    In summary, the trial court complied with Rule 431(b).  As there was no error, there was no plain error and we honor the procedural default.

¶ 94                              C. Sufficiency

¶ 95                              1. *Aggravated Battery (Count I)*

¶ 96    Next, defendant argues that the evidence was insufficient to prove that he committed aggravated battery, as alleged in count I of the indictment.  He maintains that the did not knowingly make contact of an insulting or provoking nature with Officer Callahan, where Callahan initiated the physical contact with him and disregarded defendant's repeated requests not to "touch" and "push" him and where defendant's subsequent contact with the officer was incidental to his compliance with a command to retreat.

¶ 97    When a defendant challenges the sufficiency of the evidence supporting his or her conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *People v. Collins*, 214 Ill. 2d 206, 217 (2005).  It is the function of the trier of fact to weigh and resolve conflicts in the evidence and draw reasonable inferences therefrom.  *People v. Williams*, 193 Ill. 2d 306, 338 (2000).  Nevertheless, while the jury's findings regarding witness credibility are entitled to great weight, the jury's determination is not conclusive.  *People v. Smith*, 185 Ill. 2d 532, 542 (1999).  We will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt.  *Id.*

¶ 98    A person commits aggravated battery when, "in committing a battery, ***, he or she knows the individual battered to be *** a peace officer *** performing his or her official duties[.]"  720 ILCS 5/12-3.05(d)(4)(i) (West 2018).  A person commits a battery "if he or she knowingly without legal justification by any means *** makes physical contact of an insulting or provoking nature with an individual."  720 ILCS 5/12-3(a) (West 2018).  The term "knowingly" is defined as: "[t]he result of his or her conduct, described by the statute defining the offense, when he or she is

consciously aware that that result is practically certain to be caused by his [or her] conduct."  720 ILCS 5/4-5(b) (West 2018).

¶ 99    Defendant argues that he did not knowingly make insulting or provoking contact with Officer Callahan.  According to defendant, the objective video evidence shows that he did not slap and push Callahan, as the officer alleged.  Rather, it shows that Callahan pushed defendant and grasped him around the ribcage, before commanding him to step back.  Defendant contends that his left forearm then made slight contact with Callahan's right forearm, dislodging Callahan's right hand from his ribcage (in a wax-off motion), before he immediately turned his back to Callahan and began to retreat.  Defendant maintains that, because he could not comply with the command to retreat without breaking Callahan's hold on his body, no rational trier of fact could construe the slight contact he made with Callahan to that end as insulting or provoking, nor could it conclude that he knowingly made contact of such a nature with Callahan.

¶ 100    Defendant also argues that Callahan initiated physical contact with him and defendant merely broke Callahan's hold on his ribcage in complying with the officer's order to step back after verbal attempts to get Callahan to disengage failed.  Defendant maintains that he "obviously could not comply" with the order to retreat while Callahan held on to him.  Defendant notes that, although Callahan denied that he gripped defendant's torso, the video evidence clearly showed otherwise.   The fingers of Callahan's right hand were wrapped around defendant's ribcage, extending to defendant's left armpit, and he was admittedly applying pressure.

¶ 101    Defendant also urges that the context of the stop is an important consideration.  He contends that he was understandably upset, but compliant throughout the stop.  A simple ordinance violation based on the condition of his car, he notes, turned into a lengthy traffic stop, in the middle of the night, and for no apparent reason.  He was ordered out of, and away from, his vehicle by police

for, according to defendant, an arbitrary narcotics search and felt he was being unfairly targeted and detained for racial reasons. He asked to speak to the officers' supervisor, but, defendant maintains, he nonetheless exited his car and stood where he was told to when the officers issued those commands. Prior to his attempt to do so, he further asserts, no one had told him that he was prohibited from reentering his car, even though the search was not yet underway.

¶ 102    Also, defendant argues that, as soon as Callahan blocked him from entering the car and told him he could not get back inside, defendant halted his forward progress, stepped back, an stood still. He explained that he wanted to retrieve his cell phone and argued that he was within his rights to do so. Officer Callahan, according to defendant, refused him access without explanation, grabbed and pushed him, and repeatedly shouted at him to "step back." Defendant notes that, before the grand jury, Callahan testified that he explained to defendant that he could not "go back in the car right now and he ha[d] to wait until the K-9 sniff [was] done and then he [could] go back and get his cell phone." Defendant notes that Callahan was impeached with that testimony at trial, where the video evidence showed that he had said nothing of the sort to defendant.

¶ 103    Furthermore, defendant asserts that, arguably, it was an unnecessary escalation for Callahan to persist in holding onto defendant's ribcage after he was no longer trying to reenter his car. Defendant asserts that he had to disengage Callahan's hold on his body in order to comply with the command to step back, and he only did so after verbal attempts to get Callahan to disengage failed. It was only at that point when Callahan was simultaneously grasping defendant's ribcage and ordering him to step back that defendant used his left forearm to break Callahan's hold on him. He then immediately stepped back, turned away, and attempted to retreat. Defendant urges that no reasonable person would agree that Callahan's feelings that he was insulted or

provoked by the slight contact with defendant's arm were justified under the circumstances. He also argues that no reasonable person would order someone to retreat while holding onto him in a manner that prevented compliance with that order.

¶ 104   Callahan, defendant notes, repeatedly alleged that defendant both struck and pushed him. He argues that the video evidence does not support that testimony. Rather, in defendant's view, it shows that defendant never pushed the officer and neither Mondek nor Schuttrow corroborated that allegation. Defendant notes that he questioned the officers and argued and complained at times, but these actions do not equate with noncompliance.

¶ 105   We conclude that the evidence was sufficient to sustain the aggravated battery conviction. Contrary to defendant's assertions, the video evidence was highly damaging for defendant. It clearly showed defendant quickly moving down his left arm and slapping officer Callahan's forearm, at which point the officer announced that defendant was under arrest. The video showed what appeared to be an intentional act by an agitated defendant, not an incidental or reflexive one.

¶ 106   Defendant's argument concerning the context of the stop does not undo or minimize the nature of the act at issue. Whether or not defendant was justifiably upset at what he believed to be an unreasonably extended traffic stop with questionable search aspects, the video clearly showed him slapping a police officer's forearm at about six minutes into the stop. Defendant was not protecting himself from an attack, excessive force, or any other aggressive act by the officer. Rather, defendant, who was visibly upset once he exited his vehicle, was repeatedly instructed to keep away from his car, but decided to approach the vehicle to retrieve his phone and battered the officer when the officer prevented him from doing so.

¶ 107   Although minor aspects of Officer Callahan's testimony may have been impeached, his testimony concerning the battery was consistent with the damaging video evidence. He testified

that, although defendant stated that he wanted to retrieve his phone, Callahan was unsure and knew that there was a weapon in the car—the axe handle. He placed his hand on defendant's chest to prevent him from entering his car and because defendant had not been listening to verbal commands. Defendant, according to Callahan, was agitated, confrontational, and defiant when asked to back up and to get away from the car.

> "Even with giving a light push to the sternum area to get him to try to back up on his own, he was fighting back against that, continuing to try to come forward.

> The ultimate result was him pushing me in the chest and slapping away my extended arm. I was trying to keep my arm extended to keep him away from me to prevent further confrontation and trying to prevent him from trying to get back into the car."

¶ 108   Officer Callahan testified that his "light push" (with his right hand) was intended to have defendant comply with his order, but it did not work. Defendant hit/"smacked" Callahan's extended right hand away. After defendant smacked Callahan's hand, Callahan informed defendant that he was under arrest.

¶ 109   Callahan described the slapping as insulting. Even without his testimony, the jury could have reasonably inferred as such. See *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55 ("[t]he victim does not have to testify he or she was provoked; the trier of fact can make that inference from the victim's reaction at the time"); *People v. DeRosario*, 397 Ill. App. 3d 332, 334 (2009) (contact can be insulting or provoking depending on the context, including the parties' relationship); see also *People v. Williams*, 2020 IL App (4th) 180554, ¶ 50 (terms "insulting or provoking" apply to the type of contact, not the reaction of the victim). We believe that a slap is, by its nature, an act of aggression from which one could reasonably infer an insulting or provoking nature.

¶ 110   In summary, although defendant's frustration regarding the nature and duration of his encounter with the police over a minor equipment violation may have been reasonable, we nevertheless conclude that the evidence was sufficient to sustain defendant's conviction for aggravated battery.

¶ 111                              2. *Resisting a Peace Officer (Count III)*

¶ 112   Defendant next argues that the evidence was insufficient to sustain his conviction for resisting a peace officer.

¶ 113   Again, count III alleged that defendant:

> "knowingly resisted the performance of Officer Callahan of an authorized act within his official capacity, being the arrest of the defendant, knowing Officer Callahan to be a peace officer engaged in the execution of his official duties, in that the defendant did not comply with officers' attempts to place the defendant in handcuffs, thereby causing injury to the body of Officer Callahan and said resisting was the proximate cause of said injury."

¶ 114   A person commits resisting or obstructing a peace officer, when he or she "knowingly resists or obstructs the performance by one known to the person to be a peace officer *** whose violation was the proximate cause of an injury to a peace officer[.]"  720 ILCS 5/31-1(a), (a-7) (West 2018).

¶ 115   Defendant argues that, although the indictment alleged that he resisted arrest by failing to comply with officers' attempts to place him in handcuffs, two officers (Mondek and Callahan) testified that defendant committed several acts of physical resistance.  Officer Schuttrow, he notes, did not testify to such acts, which undermined Mondek's and Callahan's testimony on that issue, as did the objective video evidence.  Defendant addresses Mondek's actions in lifting defendant

and placing him in the ground, defendant's actions once on the ground, and Callahan's alleged inconsistent accounts of the incident. As to Callahan, defendant points to his police report, where he wrote that he told defendant he was under arrest, at which point he and Mondek grabbed defendant, who resisted. According to defendant, Callahan told the grand jury that, when he and Mondek attempted to place defendant in handcuffs, defendant continued to try to pull away, fight with the officers, and not comply with their commands. At trial, Callahan testified that defendant tensed up when told he was under arrest, jerked his arms away, and got into a fighting position. He also turtled up when Mondek took him to the ground. Defendant maintains that Callahan was impeached by omission with the account in his police report. He claimed that he recalled additional facts he testified to and that his recollection was aided by rewatching the video footage. However, defendant argues, the footage does not show any of the acts of resistance the officer testified to and, at times, contradicts Callahan's trial testimony.

¶ 116 We reject defendant's argument and conclude that the evidence was sufficient to sustain the conviction for resisting a peace officer. We disagree with defendant that the evidence showed that he "pulled out of Callahan's grasp at the outset of the arrest by two other officers, who grabbed each of his arms away from Callahan in the span of one-to-three seconds and proceeded to pull him in opposing directions." Officer Callahan's body camera footage showed that, after officer Callahan announced that defendant was under arrest, he turned defendant around (*i.e.*, defendant now faced away from him) and attempted to bring both of defendant's hands behind his back. Defendant did not submit to the arrest. Also at this time, Mondek arrived and grabbed defendant's right arm, which had apparently dislodged from Callahan's hold. Even with a second officer present, defendant did not submit to the arrest, but took several steps *away* from the officers, preventing the arrest. Thus, even before Schuttrow arrived to assist the other officers, defendant's

actions showed resistance. Similarly, Mondek's body camera footage showed that, after defendant's arms broke free from Callahan's hold behind his back, defendant moved his arms forward, in front of his body with elbows bent, hunched over a bit, and took several steps away from Callahan and Mondek, preventing the officers from effectuating the arrest.

¶ 117 Callahan's testimony was consistent with the video footage. He testified that, after grabbing defendant's arms to try to place them behind his back to arrest him, defendant pulled away his arms in a "jerking motion" and tucked them in. He also tensed up his body and got into a "fighting position," at which point Mondek grabbed him. Similarly, Mondek testified that, when he reached defendant and Callahan, he grabbed defendant's right wrist and his upper arm to bring his arm behind his back to handcuff him. However, defendant pulled away and pulled "towards the center of his body" to pull away from Mondek. See *People v. Ostrowski*, 394 Ill. App. 3d 82, 98-99 (2009) (evidence sufficient to show the intoxicated defendant knowingly impeded police efforts to arrest him, where, after one or two minutes elapsed before he comprehended that the police, who approached from behind, told him he was under arrest, the defendant resisted arrest for a couple additional minutes, first walking away from the police and then struggling with them); *People v. Greenwood*, 39 Ill. App. 3d 898, 901 (1976) (conviction upheld where the defendant was approached by uniformed officers, advised that she was being arrested, and asked to cooperate and the defendant refused to comply and engaged in a physical altercation with officers); see also 720 ILCS 5/7-7 (West 2018) ("[a] person is not authorized to use force to resist an arrest which he [or she] knows is being made *** by a peace officer *** , even if he [or she] believes that the arrest is unlawful and the arrest in fact is unlawful").

¶ 118 We reject defendant's arguments concerning Officer Schuttrow's testimony. Defendant maintains that Schuttrow did not allege that defendant committed any acts of physical resistance,

pointing to his testimony that he and Mondek pushed and pulled defendant in different directions. However, defendant focuses on the wrong portion of the stop. The pushing and pulling occurred *after* Callahan announced to defendant that he was under arrest, Mondek approached, and defendant took several steps away from the officers. It was only *after* he took these steps that Schuttrow reached defendant and the other officers. After this point, defendant was taken to the ground. Defendant also addresses the turtling testimony, but this too focuses on the point in the stop when defendant was on the ground and *after* defendant had tried to walk away from Callahan and Mondek, as does his argument that the only act that he engaged in that could be construed as one of physical resistance was when he tucked his right arm under his face as he lay prone on the asphalt.

¶ 119   In summary, the evidence was sufficient to sustain defendant's conviction for resisting a peace officer.

¶ 120                    D. Lesser-Included-Offense Instruction on Count I

¶ 121   Defendant's final argument is that the trial court erred in refusing to instruct the jury in count I on resisting or obstructing a peace officer as a lesser-included offense of aggravated battery to a peace officer. He contends that the jury could have reasonably found from the video evidence that the slight contact defendant made with Officer Callahan constituted a knowing act of obstruction or resistance, but not knowing contact of an insulting or provoking nature. We disagree.

¶ 122   Giving the jury an instruction on a lesser-included offense provides an important "third option" to the jury. *People v. Ceja*, 204 Ill. 2d 332, 359 (2003). If the jury is not certain that the State has proved the charged offense but believes that a defendant is "guilty of something," the

jury might convict the defendant of the lesser offense rather than convict or acquit the defendant of the greater offense. *Id.*

¶ 123 A lesser-included offense is "established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2-9 (West 2018). When deciding whether an uncharged crime is a lesser-included offense of the charged offense, courts use the charging-instrument approach. *People v. Kennebrew*, 2013 IL 113998, ¶ 32. Under this approach, "whether a particular offense is 'lesser included' is a decision [that] must be made on a case-by-case basis ***." *People v. Kolton*, 219 Ill. 2d 353, 367 (2006). Courts look at the facts alleged in the charging instrument to ascertain whether the description of the greater (charged) offense contains a "broad foundation" or "main outline" of the lesser offense. (Internal quotation marks omitted.) *Kennebrew*, 2013 IL 113998, ¶ 30. The indictment need not explicitly state all of the elements of the lesser offense, so long as any missing element can be reasonably inferred from the indictment allegations. *Id.* Once a lesser-included offense is identified, a court must examine the evidence presented at trial to determine whether the evidence rationally supports a conviction for the lesser-included offense. *People v. Stewart*, 406 Ill. App. 3d 518, 536 (2010).

¶ 124 The trial court has discretion to decide whether an instruction is to be given, and if there is evidence supporting the lesser-included offense instruction, it is an abuse of discretion for the trial court to refuse it. *People v. Rebecca*, 2012 IL App (2d) 091259, ¶ 60. Very slight evidence upon a given theory of a case will justify a court's giving a jury instruction on the applicable law. *People v. Jones*, 175 Ill. 2d 126, 132 (1997). However, an instruction on a lesser offense may be precluded by evidence negating the possibility of a finding of guilt on the lesser offense than the one charged.

*People v. Allgood*, 242 Ill. App. 3d 1082, 1088 (1993). It is error to instruct the jury on the lesser-included offense when there is no evidence to support such an instruction. *Id.*

¶ 125 Here, in count I of the indictment, the State alleged that defendant, in committing a battery, "knowingly made contact of an insulting or provoking nature with Sean Callahan, in that he pushed and/or struck Sean Callahan about the body, knowing Sean Callahan to be a police officer engaged in the execution of his official duties." A person commits aggravated battery when, "in committing a battery, ***, he or she knows the individual battered to be *** a peace officer *** performing his or her official duties[.]" 720 ILCS 5/12-3.05(d)(4)(i) (West 2018). A person commits a battery "if he or she knowingly without legal justification by any means *** makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2018). A person commits resisting or obstructing a peace officer, when he or she "knowingly resists or obstructs the performance by one known to the person to be a peace officer *** whose violation was the proximate cause of an injury to a peace officer[.]" 720 ILCS 5/31-1(a), (a-7) (West 2018). The term "knowingly" is defined as: "[t]he result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his [or her] conduct." 720 ILCS 5/4-5(b) (West 2018). The State concedes that count I set out a broad outline of a resisting-or-obstructing charge. We agree.

¶ 126 Once a lesser-included offense is identified, "[a] defendant is entitled to a lesser included offense instruction only if an examination of the evidence reveals that it would permit a jury to rationally find the defendant guilty of the lesser offense yet acquit the defendant of the greater offense." *People v. Hamilton*, 179 Ill. 2d 319, 324 (1997). Thus, here, the question is whether there was some evidence to support a reasonable finding that defendant hit Officer Callahan with the knowledge that he would resist the officer's attempt to arrest him, but without the knowledge

that he would make contact with the officer of an insulting or provoking nature. See *People v. Hill*, 2020 IL App (1st) 162119, ¶ 22.

¶ 127 Defendant argues that this case is similar to *Hill*. In that case, police officers investigated a domestic disturbance and followed defendant inside a house, where they located him in a dark crawl space. He did not come out, kicked his legs, and hit an officer. The defendant was charged with aggravated battery to a peace officer and requested that the jury be instructed on the lesser-included offense of resisting or obstructing a peace officer. The reviewing court held that the trial court abused its discretion in refusing to give the lesser-included-offense instruction and remanded for a new trial. *Id.* ¶ 42. It concluded that a rational jury could have convicted the defendant on the obstructing charge, based on evidence that the defendant knew his kicking prevented his arrest (an officer testified that the defendant only kicked when the officers got near him) and obstructed an authorized act (evidence showed that the defendant kicked in response to the officer's requests that he exit the crawlspace). *Id.* ¶¶ 19-24. The court also determined that a rational jury could find that the evidence was *not* sufficient to support an aggravated-battery conviction, where it could find that the defendant did not act with the awareness that his kicks were practically certain to make contact at all in the dark crawlspace (he did not have full range of motion; did not kick continuously; and could not see where his kicks would land, where the officers' flashlights shone at him), let alone make contact of an insulting or provoking nature. *Id.* ¶ 25. The defendant had asserted that he faked his shaking after he was first tasered and denied intentionally kicking or hitting the officers. *Id.* ¶ 26. The court concluded that, if the jury believed the defendant, it could conclude that his act of faking electrocution showed resistance rather than aggravated battery and could find that, at most, he kicked at the officer, as opposed to making contact. *Id.*

¶ 128 The State responds that *Hill* is not helpful, asserting that defendant's knowing act of striking Officer Callahan's arm, which would be a prerequisite to a finding of guilt on the resisting-or-obstructing offense, necessarily established a knowing strike that would be insulting or provoking to Officer Callahan. It argues that defendant's striking of Callahan's arm was not an errant movement, but, rather, an intentional act toward the officer's arm. It also notes that defendant's demeanor leading up to the strike provides further evidence that he sought to intentionally strike Callahan, where defendant made several derogatory comments toward Callahan and attempted to reenter his car even after the officer instructed him that he could not be near the vehicle. The State also contends that, because defendant's defense was that his conduct was incidental to his attempt to move away from the officer, his position was that he did not knowingly make contact of any kind, and, thus, if so, there was no slight evidence that the knowing contact was not of an insulting or provoking nature.

¶ 129 On the State's final point, defendant replies that he did not assert that the contact was involuntary. Rather, he asserts, his contact was incidental, as he made only slight contact to dislodge Callahan's grip on his body before retreating and asserts that he did not slap, smack, or push Callahan. The incidental nature of his contact with Callahan, defendant argues, would permit a rational jury to find that he was not consciously aware that the contact was practically certain to be insulting or provoking. He contends that a rational jury could have found that it was not objectively reasonable for Callahan to be insulted and provoked, as he claimed, by the slight contact defendant made to break his grip on defendant's body.

¶ 130 We reject defendant's argument. Here, defendant did not merely resist arrest. As the video showed, he was angry that he could not obtain his cell phone and slapped Officer Callahan's arm. The video depicts defendant's arm striking in an intentional manner, and it was an insulting or

provoking contact. *Hill* is distinguishable. It did not involve, as here, an intentional aggressive act—a slap—by an agitated defendant. Further, the act was committed while facing the officer and there were no visual or other obstructions, all of which were critical to the *Hill* court's analysis. A rational jury could have found that Callahan was reasonably insulted and provoked by defendant's slap.

¶ 131   In summary, the trial court did not abuse its discretion in refusing to give the jury the lesser-included offense instruction.

¶ 132                            III. CONCLUSION

¶ 133   For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 134   Affirmed.